12197

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL A. SPENCER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.:  08 CV 85 |
| | ) | |
| CITY OF ROLLING MEADOWS, | ) | Judge Thomas D. Durkin |
| ILLINOIS, ROLLING MEADOWS | ) | |
| POLICE DEPARTMENT, | ) | Magistrate Judge Valdez |
| JOE PISTORIUS, MARK HINDS, and | ) | |
| D. COOK, | ) | |
| Defendants. | ) | |

**DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, CITY OF ROLLING MEADOWS, JOE PISTORIUS, MARK HINDS and DAN COOK, by and through one of their attorneys, Laura L. Scarry of DeANO & SCARRY, and respectfully submit their Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment as follows:

**List of Exhibits**

A.   Plaintiff's Third Amended Complaint;

B.   Defendants' Answer to Third Amended Complaint;

C.   Michael Spencer deposition transcript;

D.   Joyce DeLeon deposition transcript;

E.   Rolling Meadows police reports;

F.   Joseph Pistorius deposition transcript;

G.   Joseph Waitzman deposition transcript;

H.      Mark Hinds deposition transcript;

I.      Robert Doucet deposition transcript;

J.      Lisa Candir deposition transcript;

K.      Dan Cook deposition transcript;

L.      *People v. Spencer,* 408 Ill.App.3d 1, 948 N.E.2d 196 (1st Dist. 2011);

M.      *People v. Spencer,* 955 N.E.2d 478 (2011).

## Parties and Jurisdiction

1.      Plaintiff, Michael A. Spencer (hereinafter referred to as "Plaintiff" or "Mr. Spencer") is a resident of Illinois. (*See,* Third Amended Complaint [hereinafter referred to as "Complaint"], at ¶ 2, attached hereto as Exhibit A; Defendant's Answer to Third Amended Complaint [hereinafter referred to as "Answer"], at ¶ 2, attached hereto as Exhibit B); (Michael Spencer ["Spencer"] dep. tr. 5, 15-16, attached hereto as Exhibit C).

2.      Defendants, Investigator Joe Pistorius, Investigator Mark Hinds and Investigator Dan Cook, were at all relevant times employed by the City of Rolling Meadows Police Department. (Answer, ¶¶ 3-5).

3.      Jurisdiction is proper because the complaint alleges the deprivation of rights and privileges of a citizen of the United States under the color of state law pursuant to 28 U.S.C. § 1343. (Answer, ¶ 7).

4.      Venue is proper in the Eastern Division under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district. (Answer, ¶ 8).

**<u>Material Facts</u>**

5.      In October, 2005, members of the Rolling Meadows Police Department began conducting a missing person investigation of "A.K."[1] (Complaint, ¶ 9). A.K.'s mother, Joyce Kopcinski,[2] had reported to the police on Sunday, October 23, 2005 that her 17-year-old daughter, A.K., had run away from their residence located in Rolling Meadows, IL. (DeLeon dep. tr. 6, 10, 13).

6.      Two days earlier, on October 21, 2005, she, her husband at the time, and her oldest daughter had staged an "intervention" at the residence regarding A.K.'s drug use. (DeLeon dep. tr. 10). During the intervention, an argument broke out resulting in A.K. leaving the kitchen table to go to her bedroom. *Id.* After a few minutes, Joyce knocked on A.K.'s bedroom door, opened it and discovered an open window—A.K. was gone. *Id.*

7.      A.K. called Joyce on Saturday night and told her that she was not coming home. (DeLeon dep, tr. 12-13). The next day, Joyce went to the Rolling Meadows Police Department to report A.K. missing. *Id.* at 13. She spoke with Officer Schuster. *Id.* at 14.

8.      Joyce told Officer Schuster that A.K. had run away and was not coming home. (DeLeon dep. tr. 14; Police Report, pp. 455-56[3]). At the time A.K. was a junior at Rolling Meadows High School. (DeLeon dep. tr. 14-15). Joyce also informed Officer Schuster that she was leaving for a conference the next day until Wednesday, October 26th, but that her oldest daughter and her mother would be staying at the residence in the event A.K. was located and he

---

[1] As a courtesy, Defendants refer to A.K. as "A.K." throughout Defendants Motion for Summary Judgment and corresponding Memorandum of Law and Rule 56.1 Statement of Material Facts.
[2] In October 2005, Joyce was separated from her husband, Robert Kopcinski. She has since remarried and presently goes by the name Joyce DeLeon. (Joyce DeLeon dep. tr. 8-9, attached hereto as Exhibit D).
[3] The police reports relating to A.K. (No. 05-10207) and the arrest of Plaintiff, Michael Spencer, were produced by the Defendants as part of their responses to Plaintiff's Request for the Production of Documents. For purposes of this motion, the various documents that make up the police reports will be referred to by Bates stamp numbers as part of Group Exhibit E (also referred to as "Police Report").

could not get in touch with her. *Id.* at 14-18. She then gave Officer Schuster her cell phone number. *Id.* at 14.

9.      Joyce returned to work mid-afternoon the following Wednesday. (DeLeon dep. tr. 18). She was employed as a human resource specialist for the City of Rolling Meadows. (DeLeon dep. tr. 6, 19). Her office was in the same building as the police department, community development, finance and administration. *Id.* at 19.

10.     Joyce reported to police officers that day that A.K. had called on Monday to say that she was "all right" and that she heard A.K. had been seen at Woodfield Mall on Tuesday. (Police Report, p. 457; DeLeon dep. tr. 21). Joyce provided the officer(s) with two phone numbers. One was out of service and the other one, (630) 400-2830, belonged to an individual named Michael. (Police Report, p. 457; DeLeon dep. tr. 22).

11.     Joyce told the officer(s) that she called the (630) 400-2830 number (referenced by the name "Michael") and spoke to a man. (DeLeon dep. tr. 22-24). She told him that her daughter, A.K., was missing and that A.K.'s phone "call log" indicated A.K. had called this phone number on many occasions. Joyce requested that if he saw or heard from A.K. to let her know that her mother would like to come home. *Id.* "Michael" responded that he would let her know. *Id.*

12.     Rolling Meadows police also called the (630) 400-2830 number and spoke to "Michael." (Police Report, p. 457). Michael stated that he did not know where A.K. was but acknowledged that he knew A.K. through mutual friends. *Id.* Michael refused to provide any additional information. *Id.*

13.     On October 26-27, 2005, Joyce informed Officers Farmer and Pistorius that A.K. was on anti-anxiety medication and had not been taking her medicine for the last four months.

(DeLeon dep. tr. 27; Police Report, pp. 458-59; Joseph Pistorius ["Pistorius"] dep. tr. 19-20, attached hereto as Exhibit F). She stated that A.K. has a history of out-of-control behavior and "cutting," and had previously seen a mental health practitioner for those issues. (Police Report, p. 459; Pistorius dep. tr. 19-20).

14.    Officer Josesph Pistorius has been employed as a Rolling Meadows police officer since 1985. (Pistorius dep. tr. 7). He was in the Investigations Unit from 2002 to 2010 as a school resource officer for the Rolling Meadows High School. (Pistorius dep. tr. 11-12). He has received training on missing and exploited children that was a week in length. (Pistorius det. tr. 6-7).

15.    Commander Joseph Waitzman, the supervisor in charge of the Investigations Unit of the Rolling Meadows Police Department, assigned Investigator Pistorius to A.K.'s case. (Pistorius dep. tr. 15-16; Joseph Waitzman ["Waitzman'] dep. tr. 8-9, attached hereto as Exhibit G). Investigator Pistorius became involved in the case after Officers Schuster and Farmer took the initial reports. *Id.*

16.    Investigator Pistorius spoke to several individuals at the Rolling Meadows High School and the surrounding towns in an effort to locate A.K.. (Pistorius dep. tr. 17-19). These individuals, including a former boyfriend, stated they did not know where she was. (*Id.*; Police Report, pp. 459-60, 465-66). Investigator Pistorius learned that A.K. was involved in drug use— cannabis, cocaine and heroine. (Police Report, pp. 465-66). Investigator Pistorius completed a flyer regarding A.K.'s disappearance which he, along with Investigator Hinds[4], distributed to local police departments. (Pistorius dep. tr. 18; Police Report, pp. 453, 460, 468; Mark Hinds ["Hinds"] dep. tr. 10, attached hereto as Exhibit H).

---

[4] Investigator Hinds has been employed as a Rolling Meadows police officer since 1987. (Hinds dep. tr. 3-4).

17.      On November 2, 2005, Investigator Pistorius received an e-mail from Commander Waitzman containing phone numbers of several friends of A.K.'s. (Police Report, pp. 468-69). One of the phone numbers was for a female named "Hannah." *Id.*

18.      On November 7, 2005, Investigator Pistorius spoke with A.K.'s school counselor who informed him that she believed A.K. had run away from home due to her drug use. *Id.* The counselor reported that she had a conference with Joyce and A.K. two days prior to A.K. running away, at which time A.K. disclosed her drug use and admitted she needed help. *Id.* Investigator Pistorius received confirmation later that day that A.K. was a regular user of cannabis and cocaine, and experimented with heroine. (Police Report, p. 470).

19.      On November 8, 2005, at a meeting between several investigators, it was suggested that they make contact with the three individuals referred to in Commander Waitzman's earlier e-mail. (Police Report, p. 470). Commander Waitzman advised Investigator Pistorius that he spoke to "Hannah" who told him that she saw A.K. on November 4, 2005 at a movie theater. *Id.* He also told Investigator Pistorius that he asked "Hannah" to convince A.K. to come home. *Id.*

20.      On November 10, 2005, Investigator Pistorius arranged a meeting at Joyce's home for the purpose of searching A.K.'s bedroom to look for additional clues regarding A.K.'s whereabouts. (Police Report, pp. 471-72). Joyce was very reluctant to allow Investigator Pistorius to search A.K.'s bedroom. (*Id.*; DeLeon dep. tr. 28-30).

21.      Also on November 10, 2005, Investigator Pistorius spoke to another acquaintance of A.K. who reported that while attending night school at "Forest View," he spoke with another student, Lisa Candir, who may have knowledge of A.K.'s whereabouts. (Police Report, p. 473).

22.     On November 11, 2005, Commander Waitzman and Investigator Pistorius spoke with Lisa Candir at L.A. Tan, her place of employment. (Police Report, p. 474; Pistorius dep. tr. 43-44). She claimed to not have seen A.K. for the last 3 months but reported that A.K. would be seen hanging out at malls picking up strange guys she had just met. *Id.*

23.     That same day, Commander Waitzman provided Investigator Pistorius a list of phone numbers that Joyce had found in A.K.'s bedroom. (Police Report, pp. 474, 480).

24.     On November 14 or 16, 2005, A.K. had called Joyce so that she could wish her older sister a happy birthday. (DeLeon dep. tr. 32). Joyce relayed the phone number A.K. had called from to Investigator Pistorius later that day. (DeLeon dep. tr. 35; Police Report, p. 483). Investigator Pistorius learned that the phone number registered to a payphone at a White Hen at 148 Bloomingdale Rd., Bloomingdale, IL. (Police Report, p. 483).

25.     After learning from Investigator Pistorius that A.K. was not at that location, Joyce and her oldest daughter took a picture of A.K. and drove to the strip mall at 7:00 or 8:00 p.m. in an attempt to find A.K.. (DeLeon dep. tr. 35-36). Joyce spoke to a manager of Baskin-Robbins and asked him if he had seen A.K.. *Id.* When he said he had not, Joyce asked him if he saw her in the future to tell A.K. that she loved her and wanted her to come home. *Id.*

26.     On November 18, 2005, Investigator Pistorius, along with Investigator Doucet who was assisting in the investigation, went to the residence of Hanna Leonard located at 568 S. Oak St., Palatine, IL in an effort to locate A.K.. (Police Report, p. 484; Pistorius dep. tr. 28-31; Robert Doucet ["Doucet"] dep. tr. 5-7, attached hereto as Exhibit I). Investigator Pistorius was given Hanna's name from Joyce as A.K. and Hanna used to work together cleaning houses. (Police Report, p. 484; Pistorius dep. tr. 28-31).

27.     Investigators Doucet and Pistorius approached the house but no one answered the door. (Police Report, p. 484; Pistorius dep. tr. 31). They decided to park their vehicle to conduct surveillance on the residence. *Id.* At approximately 8 p.m. a dark-colored Land Rover vehicle pulled into the driveway and a female and male exited. (Police Report, p. 484).

28.     Investigators Doucet and Pistorius approached and identified themselves as Rolling Meadows police officers. (Pistorius dep. tr. 31; Doucet dep. tr. 7-8). The female identified herself as Hanna Leonard and the male identified himself as Michael Spencer. (Police Report, p. 484). The officers advised Hanna that they were there to request her assistance in locating A.K.. (Pistorius dep. tr. 31-32). Both Hanna and Mr. Spencer advised that they did not know the whereabouts of A.K. and invited the officers inside the residence to check for themselves. (Police Report, p. 484; Pistorius dep. tr. 32-33).

29.     Investigator Doucet stood with Hanna inside the front door while Mr. Spencer took Investigator Pistorius through the rest of the house. (Police Report 484; Pistorius dep. tr. 33; Doucet dep. tr. 7-8). A.K. was not in the house. (Pistorius dep. tr. 33). However, Investigator Pistorius observed an elaborate photography/picture studio with cameras, video equipment and backdrops, along with props and objects (feather fans and lingerie) hanging on the wall. (Pistorius dep. tr. 33-34; Police Report, p. 484). Mr. Spencer stated that he was "into photography." (Police Report, p. 484).

30.     When they left the residence, Investigator Pistorius told Investigator Doucet that "something was going on." (Pistorius dep. tr. 33-34). At the very minimum, Investigator Pistorius believed that the equipment was being used for some pornographic enterprise. (Pistorius dep. tr. 34). Investigator Pistorius knew that it was illegal to pose nude for photography depending on the age of the person being photographed. (Pistorius dep. tr. 35).

8

31.     On November 28, 2005, a friend of A.K.'s met with Investigator Pistorius at the Rolling Meadows High School to report an incident that occurred on November 23rd. (Police Report, p. 486). While she was working at a restaurant, a male Black approached her and began speaking to her. (Police Report p. 486; Pistorius dep. tr. 41-42). When the male Black told her that they had a friend in common and that the friend was a runaway, she knew that he was referring to A.K.. *Id.* After confirming that he was referring to A.K., the male Black asked her what time she got off of work and whether she would be willing to meet with him. *Id.* She lied about what time she got off of work. *Id.* After observing the male Black sitting in a dark-colored SUV in the parking lot, she became concerned and a manager escorted her to her car. *Id.* That was the last time she saw him. *Id.* Investigator Pistorius showed the friend a picture of Mr. Spencer and she positively identified him as being the person at the restaurant the other night. *Id.*

32.     Investigator Doucet took it upon himself to "google" the phone number of (630) 400-2830. (Doucet dep. tr. 9-10; Pistorius dep. tr. 39-40). The phone number was attached to a website called www.sirenseroticentertainment.com. (Pistorius dep. tr. 39-40; Doucet dep. tr. 10). Investigator Doucet clicked on to the website which identified Michael Spencer as being the contact person. (Police Report, p. 489). Investigator Doucet observed pictures of girls dressed provocatively, searched the identities of the girls and identified one that was believed to be A.K.. (Doucet dep. tr. 10). A.K.'s screen name on the website was "Sadie." (Police Report, p. 489).

33.     In an effort to contact A.K., Investigator Doucet created a false identity for the purpose of "passing" the "background check" and being "verified" through www.roomservice2000.com to become a "member" of the www.sirenseroticentertainment.com website. (Doucet dep. tr. 10-11; Police Report, p. 489).

9

34.     On December 30, 2005, Investigator Doucet received an e-mail notifying him that he had passed the background check through www.roomservice2000.com. (Police Report, p. 489).

35.     On January 3, 2006, Investigator Doucet called (630) 400-2830, the number attached to the www.sirenseroticentertainment.com website with the intent to meet "Sadie" ("A.K."). (Police Report, p. 489). A person who identified himself as "Michael" answered the phone. *Id.* Investigator Doucet (using his false identity) told Michael that he was interested in meeting "Sadie." *Id.* Michael said that "Sadie" was not available that evening but would be on the next night. *Id.* Michael also stated that he could not go into details about the services his "models" offered until he knew that Investigator Doucet was "verified." *Id.* Michael stated that he would call Investigator Doucet the next day at noon after Doucet was "verified." *Id.*

36.     On January 4, 2006, when Michael failed to call Investigator Doucet at noon, Investigator Doucet called the (630) 400-2830 number. (Police Report, p. 489). Again, an individual identified as "Michael" answered the phone. *Id.* Michael said that "Sadie" was no longer taking on new clients. *Id.* Investigator Doucet told Michael that he would call him back after he selected a new model. *Id.* Investigator Doucet dialed the number fifteen minutes later; no one answered and Investigator Doucet left a voicemail. *Id.* Michael never called back, and Investigator Doucet did not attempt to contact him through that number again. *Id.*

37.     Later that same day, Investigator Doucet and Commander Waitzman visited Lisa Candir's home located in Arlington Heights to speak to Lisa. (Police Report, p. 491; Doucet dep. tr. 15-16). They were met by Lisa's mother who told them Lisa was attending night school. (Police Report, p. 491). They explained to Lisa's mother that they were looking for a missing juvenile who was associated with the website www.sirenseroticentertainment.com and that

Lisa's picture also appeared on the website. *Id.* Lisa's mother advised the officers that she was aware of the website because her ex-husband is a member of www.roomservice2000.com and saw Lisa's photo on the website. *Id.*

38.     Lisa's mother also told the officers that she routinely searches Lisa's room and recently discovered a hotel key belonging to Hawthorn Suites in Lisa's wallet. (Police Report, p. 491). She also found "sexy" clothes in Lisa's room. *Id.* She told the officers that Lisa stays out until the early morning hours. *Id.*

39.     While speaking with Lisa's mother, Lisa had telephoned Investigator Doucet in response to a voicemail he left her earlier that day. (Police Report, p. 491; Doucet dep. tr. 16-17). Investigator Doucet explained to her that he needed to speak to her about A.K., a missing juvenile. *Id.* Lisa agreed to meet Investigator Doucet at the Rolling Meadows Police Department that evening at 7:30 p.m. *Id.* After advising Lisa's mom that Lisa agreed to meet them at the police department later that night, the officers left. *Id.*

40.     At 7:30 p.m. Commander Waitzman and Investigator Doucet spoke with Lisa Candir at the Rolling Meadows Police Department. (Police Report, p. 492; Doucet dep. tr. 17; Waitzman dep. tr. 15). Lisa told the officers that she was employed at L.A. Tan in Rolling Meadows. (Police Report, p. 492). She told them that A.K. was a client of L.A. Tan and knew that she was missing. (Police Report, p. 492; Lisa Candir ["Candir'] dep. tr. 23-24, attached hereto as Exhibit J). The officers told Lisa that they observed Lisa's photograph on the www.sirseroticentertainment.com website and that they had reason to believe that A.K. also worked for the organization based on A.K.'s phone records recovered as a result of a grand jury subpoena. (Police Report, p. 492). They explained that the phone number (630) 400-2830 appeared numerous times and that the phone number is attached to the

www.sirenseroticentertainment.com website. *Id.* They also told Lisa that A.K.'s picture appears on the website. *Id.*

41.     During the interview, Lisa admitted to knowing that A.K.'s picture appeared on the website and that A.K. was only 17 years old. (Police Report, p. 492). She stated that Michael Spencer was the contact person for the website. *Id.* She first met Mr. Spencer when he brought his roommate, Hanna Leonard, to L.A. Tan to tan. *Id.* Mr. Spencer spoke to Lisa about his website and recruited her to be a model and call girl. *Id.* She then explained how the operation worked. *Id.*

42.     Lisa stated that the website is a call girl service that is made to appear as an escort or modeling service. (Police Report, p. 493; Candir dep. tr. 25-26). When a client calls Mr. Spencer and requests a companion, Mr. Spencer explains that the client needs to be "verified" through www.roomservice2000.com. (Police Report, p. 493; Candir dep. tr. 26-27). Once the client passes the background check, Mr. Spencer calls the client back and they arrange a date, time and location for a meet with the call girl. *Id.*

43.     Lisa told the officers that Mr. Spencer would recommend that the client proceed to a hotel with a pre-rented hotel room. *Id.* Mr. Spencer preferred Hawthorne Suites in Schaumburg. *Id.* Once the client arrives in the lobby, the client is instructed to go to the pre-rented room at the hotel. (Police Report, p. 493; Candir dep. tr. 28).

44.     Once inside the hotel room, the client informs the call girl of the price of the service that had been pre-negotiated between the client and Mr. Spencer. (Police Report, p. 493; Candir dep. tr. 28). Payment would ordinarily be made in cash. *Id.* The client and call girl would engage in sex acts that were pre-negotiated by Mr. Spencer. (Police Report, p. 493; Candir dep. tr. 28-30; Waitzman dep. tr. 15-16).

45.     Once the sex acts were completed, the call girl would meet Mr. Spencer in the hotel parking lot. (Police Report, p. 493; Candir dep. tr. 30). Mr. Spencer would receive 50% of the proceeds and the call girl (including her) would keep the rest. (Police Report, p. 493; Candir dep. tr. 30-31). Some of the other call girls would have different percentages depending upon their drug use. *Id.* In other words, the more drugs Mr. Spencer supplied to the call girl, the greater percentage Mr. Spencer received. *Id.*

46.     Lisa refused to inform the officers the number of "acts of companionship" she performed for Mr. Spencer's business. (Police Report, p. 493; Candir dep. tr. 32). She did confirm, however, that her first activity associated with Mr. Spencer's website was posing in suggestive clothing in Mr. Spencer's basement studio located at 568 S. Oak, Palatine, IL. *Id.*

47.     During the interview, Investigator Doucet stepped out to convey the information Lisa had told him to Investigator Pistorius. (Police Report, p. 495; Doucet dep. tr. 22-23; Waitzman dep. tr. 21-22, 27; Pistorius dep. tr. 52-53). Investigator Pistorius learned that Lisa was a call girl for Mr. Spencer and that A.K. also worked for Mr. Spencer. *Id.* He learned that pictures of Lisa and A.K. appeared on a website Mr. Spencer was associated with. *Id.*

48.     After speaking with Investigator Doucet, Investigator Pistorius visited the website and observed a picture of "Sadie" that resembled A.K.. (Police Report, p. 495; Pistorius dep. tr. 54-55). At that point, Investigator Pistorius believed that Mr. Spencer was running some sort of prostitution ring and was using his website as a cover for the operation. (Pistorius dep. tr. 55-56). Armed with the above-information, Investigator Pistorius left with Investigator Hinds to go to Mr. Spencer's home at 568 Oak St., Palatine, IL to arrest Mr. Spencer for pandering. (Police Report, p. 495; Waitzman dep. tr. 23; Pistorius dep. tr. 57-58). The hope was, since there was probable cause to arrest Mr. Spencer for pandering, that that would help further the investigation

into locating A.K.. (Waitzman dep. tr. 24). Investigator Hinds did not know that Mr. Spencer was going to be arrested. (Hinds dep. tr. 13-14).

49.     Investigators Pistorius and Hinds arrived at Mr. Spencer's home at approximately 8:15 p.m. (Police Report, p. 495). They knocked on the front door several times and when they did not get an answer, they walked around the house. (Hinds dep. tr. 13; Pistorius dep. 59-60). There was one light on in the house but they could not see anyone. *Id.*

50.     After informing Commander Waitzman via Nextel that no one was at the Spencer residence, Investigators Pistorius and Hinds conducted surveillance on the house. (Police Report, p. 495; Hinds dep. tr. 13; Pistorius dep. tr. 60). At approximately 9:00 p.m. they observed the garage door of the Spencer residence open and a tan vehicle exit and turn north. (Police Report, p. 495; Hinds dep. tr. 14; Pistorius dep. tr. 60). Investigators Pistorius and Hinds followed the vehicle in their unmarked Jeep Cherokee through residential streets in an attempt to run the license plate through their system to learn of the identity of the vehicle's registered owner. (Police Report, p. 495; Hinds dep. tr. 14-15; Pistorius dep. 61-62). The vehicle was driving faster than the posted speed limit and it appeared that the driver was trying to evade them. (Hinds dep. tr. 14-15; Pistorius dep. tr. 63-64)

51.     The license plate information revealed that the vehicle, a BMW, registered to Michael Spencer. (Police Report, p. 495; Pistorius dep. tr. 63). Lisa Candir previously informed the officers that Mr. Spencer usually drives a BMW or Land Rover. (Police Report, p. 494; Candir dep. tr. 33). About a minute after the vehicle pulled out of the garage, the investigators activated their lights on Quentin Rd. (Police Report, p. 495). Mr. Spencer chose to drive his vehicle into the parking lot of Fremd High School located at the intersection of Quentin and Illinois. (Police Report, p. 495; Hinds dep. tr. 15-16).

52.     Upon stopping his vehicle inside the parking lot, Mr. Spencer exited the vehicle, closed his driver's door, and activated the vehicle's alarm system and put his keys in his pocket. (Hinds dep. tr. 16-17).

53.     Investigators Pistorius and Hinds approached and identified themselves. (Police Report, p. 495). At the time, Investigator Hinds did not know of Investigator Pistorius' intention to arrest Mr. Spencer. (Hinds dep. tr. 17). However, Investigator Hinds admitted that this was Investigator Pistorius' case and that he was only there to assist him. *Id.* In fact, Investigator Pistorius was doing all the talking with Mr. Spencer. (Hinds dep. tr. 17-18).

54.     Investigator Pistorius asked Mr. Spencer where A.K. was. (Hinds dep. tr. 19-20; Pistorius dep. tr. 73). After denying any knowledge of A.K.'s whereabouts, Investigator Hinds stepped away from the two individuals and notified Commander Waitzman via Nextel about the conversation. *Id.* Commander Waitzman told Investigator Hinds that based on the statement they had received from Lisa Candir that she was pimping for Mr. Spencer and performing acts of prostitution, they could arrest Mr. Spencer for pandering. (Hinds dep. tr. 20-21; Waitzman dep. tr. 23-24; Pistorius dep. tr. 73-74).

55.     Investigator Hinds walked back toward Investigator Pistorius and Mr. Spencer making a motion with his hands indicating that Mr. Spencer is to be arrested. (Hinds dep. tr. 21-22). Investigator Pistorius arrested Mr. Spencer for pandering. (Police Report, p. 495).

56.     A marked squad car was called to the scene to transport Mr. Spencer to the police department. (Hinds dep. tr. 23). Investigator Pistorius conducted a pat-down search of Mr. Spencer and located $8,000.00 in his pants pocket. (Police Report, p. 496; Pistorius dep. tr. 87-

88). By this time, Officer Dan Cook[5] had arrived with Commander Waitzman. (Cook dep. tr. 11-12; Waitzman dep. tr. 27-28).

57.     Officer McMahon arrived and transported Mr. Spencer to the Rolling Meadows Police Department. (Police Report, p. 496; Hinds dep. tr. 23). Commander Waitzman rode back with Officer McMahon and Mr. Spencer. (Cook dep. tr. 13; Waitzman dep. tr. 30-31).

58.     Investigators Pistorius and Hinds then searched Mr. Spencer's vehicle using keys retrieved from Mr. Spencer. (Hinds dep. tr. 24-25). Officer Cook did not participate in the search of the vehicle. (Hinds dep. tr. 25; Cook dep. tr. 15). The officers had probable cause to search the vehicle for pandering. (Waitzman dep. tr. 41-43, 46-48; Pistorius dep. tr. 93-96).

59.     Officer Hinds located several Blackberry phones and a laptop computer in the interior of Mr. Spencer's car. (Hinds dep. tr. 19, 26-27, 33). Investigator Pistorius located a 12"x12" metal box in the trunk of Mr. Spencer's car. (Police Report, p. 496). Investigator Pistorius used a key from Mr. Spencer's key chain to open the box. (Police Report, p. 496). Upon opening the metal box, Investigator Pistorius found several bundles of one-hundred-dollar bills wrapped in rubber bands and several small clear plastic baggies that contained a white powdered substance. (Police Report, p. 496). Investigator Pistorius took custody of the metal box, the laptop computer and telephones and went back to the Rolling Meadows Police Department. (Pistorius dep. tr. 122-23).

60.     Mr. Spencer's vehicle was then towed from the parking lot. (Police Report, p. 496; 740).

---

[5] Investigator Cook has been employed by the Rolling Meadows Police Department since 1999. (Dan Cook ["Cook"] dep. tr. 3, attached hereto as Exhibit K). He had no involvement with this case until Commander Waitzman ordered him to go with him to the Fremd High School parking lot where Investigators Pistorius and Hinds were present with Mr. Spencer. (Cook dep. tr. 10). He was there maybe 2-3 minutes before he left to engage in another assignment. *Id.* He had no knowledge of the missing person investigation or involvement in it up until this point. *Id.*

61. At approximately 9:00 p.m. and based on the information received from Lisa Candir, Investigator Cook and Investigator Doucet went to Hawthorne Suites in Schaumburg, IL to find A.K.. (Police Report, p. 497). They learned that Mr. Spencer was renting two rooms, #204 and #108. Room #204 had been rented by Mr. Spencer since November 18, 2005 and Room #108 had been rented by him since December 6, 2005. (Police Report, p. 497).

62. The investigators knocked on the door of Room #204 and Hanna Leonard answered the door. (Police Report, p. 497). Hanna stated she did not know where A.K. was and had not seen or heard from her in the last few months. (Police Report, p. 497). When asked who was staying in Room #108, Hanna replied that she did not know. *Id.* While Investigator Doucet stayed with Hana, Investigator Cook went to Room #108 and found the room empty except for a lit candle, "costume" lingerie and "sex" toys. (Police Report, p. 497). There was no evidence that A.K. was there. (Police Report, p. 497).

63. At the police department, Investigator Pistorius questioned Mr. Spencer about his knowledge into the disappearance of A.K.. (Police Report, p. 496). Mr. Spencer denied knowing where A.K. was. (Police Report, p. 496).

64. At about 2:00 a.m. on January 6, 2005, Joyce was woken up by banging on the front door. (DeLeon dep. tr. 40). Thinking that her oldest daughter had forgotten her key, Joyce went to the door. *Id.* Upon looking out the door window, Joyce thought she had seen a ghost. *Id.* Standing there was a very thin, very pale, very blonde A.K.. *Id.*

65. Having come to terms that previous Christmas that A.K. was probably dead, and knowing that she was supposed to call the police immediately if she heard or saw A.K., Joyce was shocked that A.K. was standing there before her. (DeLeon dep. tr. 40-41). A.K. was with young man and was verbally and physically agitated. *Id.* She kept talking about things that did

not make any sense to Joyce. (DeLeon dep. tr. 49-50). A.K. said something about "something got broken up, I didn't know what to do." *Id.*

66.     A.K. was at the house 20 minutes before she told Joyce she was leaving. (DeLeon dep. tr. 41-42). Suddenly, it dawned on Joyce that she was supposed to call the police. *Id.* A.K. asked Joyce if she could come home to take a shower later in the morning and left. *Id.*

67.     Joyce called Deputy Chief Scanlan after she got up and told him that A.K. would be coming back later that morning. (DeLeon dep. tr. 43). They devised a plan to ensure that a police officer was at the residence without A.K.'s knowledge so that she could be taken into custody. (DeLeon dep. tr. 43-45).

68.     A.K. arrived home just as she said she would. (DeLeon dep. tr. 44-45). She and the young man that she was with were both taken into police custody. (*Id; Police Report, pp. 551-54). Rolling Meadows police officers charged the young man with the crime of harboring a runaway since he admitted to being aware that A.K. was a runaway and had been told by Rolling Meadows police officers to contact them in the event he saw A.K. or knew of her whereabouts. (Police Report, pp. 551-54).

69.     A.K. was transported to the Rolling Meadows Police Department where she described Mr. Spencer's prostitution ring in a written statement. (Police Report, pp. 569-70). Later than night, A.K. was taken to a hospital where she was admitted for treatment. (Police Report, pp. 553-54).

70.     On January 6, 2006, Commander Waitzman received approval from the Cook County State's Attorney to charge Mr. Spencer with possession of a controlled substance with the intent to deliver. (Police Report, p. 555). At his bond hearing that day, Mr. Spencer was held

on a $200,000.00 D-Bond. *Id.* Search warrants were also approved by a judge for Mr. Spencer's home and telephones and computer. *Id.*

71.    On a later date, Mr. Spencer was charged with pandering. (Police Report, p. 1214; Spencer dep. tr. 211). The court issued a $100,000.00 D-Bond for the pandering charge. *Id.*

72.    Prior to trial, Mr. Spencer filed a motion to quash his arrest and suppress illegally obtained evidence. *People v. Spencer,* 408 Ill.App.3d 1, 948 N.E.2d 196 (1st Dist. 2011), attached hereto as Exhibit L. The court denied Mr. Spencer's motion to quash, finding that the search of his vehicle was a proper inventory search. *Id.* at 200. The court also denied Mr. Spencer's motion to suppress and motion to reconsider the denial of his previous motion to quash stating that the search of Mr. Spencer's car was a legal search incident to an arrest and pursuant to police procedures relating to an inventory search. *Id.*

73.    A jury convicted Mr. Spencer on the charge of possession of a controlled substance with intent to deliver and he was sentenced to 15 years imprisonment. (*Id.* at 200-01; Spencer dep. tr. 219). Mr. Spencer appealed.

74.    The First District Appellate Court reversed stating that evidence supported a finding that the impoundment of Mr. Spencer's vehicle was not lawful and that the warrantless search of his vehicle was not justified as an inventory search following his arrest. *People v. Spencer*, 408 Ill.App.3d at 7-12, 948 N.E.2d at 202-06. The appellate court did not rule on whether the search of the vehicle was lawful pursuant to probable cause presumably because the State of Illinois never presented that theory to the court. Shortly thereafter, Mr. Spencer was released from custody. (Spencer dep. tr. 220).

75.     The State of Illinois filed a petition for leave to appeal before the Illinois Supreme

Court which was denied. *People v. Spencer,* 955 N.E.2d 478 (2011), attached hereto as Exhibit

M.

                                        Respectfully submitted,

                                        DeANO AND SCARRY, LLC.


                                        s/Laura L. Scarry
                                        Attorneys for Defendants,
                                        JOE PISTORIUS, MARK HINDS, DAN COOK**,**
                                        and THE CITY OF ROLLING MEADOWS

Laura L. Scarry ARDC#6231266
**DeAno & Scarry, LLC**
53 West Jackson Boulevard
Suite 550
Chicago, IL  60604
Tel:  (630) 690-2800
Fax:  (312) 564-4125