### Page 1

```
     IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

MICHAEL A. SPENCER,           )
          Plaintiff,          )
     -vs-                     ) No. 08 CV 00085
THE CITY OF ROLLING MEADOWS,  )
THE ROLLING MEADOWS POLICE    )
DEPARTMENT, OFFICER JOE       )
PISTORIUS, OFFICER MARK HINDS )
and OFFICER DAN COOK,         )
          Defendants.         )
```

The deposition of MARK HINDS, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before V. LINDA BOESCH, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter, CSR No. 84-3108, of said state, at Suite 3000, 70 West Madison Street, Chicago, Illinois, on December 18, 2012, at 10:03 a.m.

### Page 2

PRESENT:

    K&L GATES, LLP,
    (70 West Madison Street, Suite 3100,
    Chicago, Illinois 60602-4207,
    312-372-1121), by:
    MS. MOLLY K. McGINLEY,
    molly.mcginley@klgates.com,
      appeared on behalf of the Plaintiff;

    DeANO & SCARRY,
    (53 West Jackson Boulevard, Suite 550,
    Chicago, Illinois 60604,
    312-690-2800 x102), by:
    MS. LAURA L. SCARRY,
    lscarry@deanoandscarry.com,
      appeared on behalf of the Defendants.

REPORTED BY: V. LINDA BOESCH, CSR No. 84-3108.

### Page 3

    (WHEREUPON, a certain document was marked Plaintiff's Deposition Exhibit No. 1, for identification, as of 12/18/2012.)

    (WHEREUPON, the witness was duly sworn.)

    MS. McGINLEY: And let the record reflect this is the deposition of Mark Hinds, taken pursuant to the Federal Rules of Civil Procedure and the local rules of the Northern District of Illinois.

    MARK HINDS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

    EXAMINATION
BY MS. McGINLEY:

    Q.   Could you please state your name for the record?

    A.   Mark Hinds, H-I-N-D- like David, S.

    Q.   And your current employment?

    A.   I'm a patrol officer with the City of Rolling Meadows.

    Q.   And how long have you been with the Rolling Meadows Police Department?

### Page 4

    A.   It will be 26 years in January.

    Q.   Okay. And what was your title in October, 2005, and through, basically, January of 2006?

    A.   Detective or investigator.

    Q.   Okay. Did you review any documents before your deposition today?

    A.   Yes.

    Q.   What documents did you review?

    A.   Our towing policy or towing procedures, the entire case report which I had never seen before. I'm trying to think was there anything else that I was looking -- probably went over our interrogatories and some of that stuff. I also went over my court testimony at the trial, too, read that.

    Q.   And the case file includes the reports that were completed by officers and detectives working on Mr. Spencer's case?

    A.   Yes.

    Q.   Okay. Have you been deposed before?

    A.   A time or two, yes.

    Q.   Okay. So you're probably familiar with the rules but just to remind you, you have to give a verbal answer rather than nod your head.




Page 5

1  A. Right.
2  Q. And I'll assume that you understood my
3  question if you answer, but if for some reason, it's
4  unclear, just ask me and I can clarify or restate the
5  question in a way that you understand it.
6  A. I'm not bashful.
7  Q. Okay. I'm going to go ahead and start
8  with your training, the training that came into play
9  around that time of October, 2005, through January,
10 2006.
11     Were you trained on the towing policy and
12 procedure that was in place?
13 A. Yes.
14 Q. And what did that training entail?
15 A. Probably just the fact that the policy
16 had been upgraded at some point. We're usually sent
17 an e-mail and told to read and familiarize yourself
18 with it.
19 Q. Okay. And then as for the search and
20 seizure policy and procedures, were you trained on
21 that as well during that time period?
22 A. I can't say that I was in that time
23 period. I know that I had been to some training but
24 I think it might have been prior to when I was in the

Page 6

1  Investigations Unit. I'd have to see my training
2  records to know.
3  Q. Okay. You were familiar with the search
4  and seizure policies and procedures that were in
5  place during that time?
6  A. Yes.
7  Q. And during that time -- and I'm going to,
8  just for the record, unless I say otherwise, the time
9  period that I'm referring to is going to be that
10 October, 2005, through 2006 if we are talking about a
11 policy or procedure.
12 A. Okay.
13 Q. Was it the policy of Rolling Meadows
14 Police Department to tow a vehicle whenever a lone
15 occupant had been arrested and taken from the scene?
16 A. Yes.
17 Q. And at that time, was it the policy or
18 procedure of Rolling Meadows Police Department to
19 conduct an inventory -- a custodial inventory search
20 of the car whenever it was towed?
21 A. Yes.
22 Q. Okay. Do you recall whether that's what
23 happened when Michael Spencer was arrested?
24 A. Well, we did a search of his car pursuant

Page 7

1  to probable cause. Ultimately, we would have
2  searched the interior of the car had it been no
3  probable cause and a tow had been affected.
4      But when we had probable cause, we
5  searched the entire car.
6  Q. So it was search pursuant to probable
7  cause and not pursuant to the inventory custodial
8  search policy?
9  A. Correct.
10 Q. And you testified, as you mentioned, at
11 the trial of Michael Spencer?
12 A. Right.
13 Q. I'm going to go ahead and mark as --
14 actually, I've already marked as Exhibit 1 the Notice
15 of Deposition, so we'll put that into the record. I
16 can show that to you but it's today's Notice of
17 Deposition.
18     MS. McGINLEY: And here's a copy for you as
19 well.
20         (WHEREUPON, the document was
21         tendered to the witness and
22         counsel.)
23 MS. SCARRY: Thank you.
24 THE WITNESS: Okay.

Page 8

1  BY MS. McGINLEY:
2  Q. And I'm going to go ahead and mark as
3  Exhibit 2, a copy of -- it's actually an excerpt from
4  the criminal trial of Michael Spencer containing your
5  testimony and a cover page.
6         (WHEREUPON, a certain document
7         was marked Plaintiff's Deposition
8         Exhibit No. 2, for
9         identification, as of
10        12/18/2012.)
11        (WHEREUPON, the document was
12        tendered to the witness.)
13 BY MS. McGINLEY:
14 Q. And I'll have you turn to -- there's page
15 numbers in the lower right-hand corner -- 786. It's
16 like the second page from the end.
17 A. I'm getting there.
18 Q. Or a few pages from the end. Okay. And
19 when you testified at this trial, your testimony was
20 truthful, is that correct?
21 A. Yes.
22 Q. And do you recall testifying that the car
23 was towed pursuant to procedure?
24 MS. SCARRY: (Indicating.)



Page 9

1  BY MS. McGINLEY:
2     Q.   Police procedures?
3     MS. SCARRY:  Right here (indicating).
4  BY THE WITNESS:
5     A.   Yes.
6  BY MS. McGINLEY:
7     Q.   And that an inventory search was
8  conducted?
9     A.   Yes.
10    Q.   Okay. And is there a difference between
11 a probable cause search and an inventory search?
12    A.   An inventory search would limit me to the
13 passenger compartment of his car and probably
14 everything, you know, within his reach. It may not
15 be behind the seats. It depends on the type of car
16 it is.
17       A probable cause search is going to allow
18 me to search the whole vehicle because I have
19 probable cause to believe that there's evidence of
20 criminal activity in that vehicle.
21    Q.   Okay. So does this change your testimony
22 as to whether it was a probable cause search or an
23 inventory search, the fact that you testified at his
24 criminal trial that it was an inventory search?

Page 10

1     A.   I wasn't asked if it was a probable cause
2  search. I guess I would say it's an inventory search
3  as well as a probable cause search. It's kind of
4  both. It's both.
5     Q.   Okay. And let me just -- I'll show you
6  what is marked as -- well, I'll come back to that.
7        Do you recall working on the missing
8  persons investigation for Anna M. Kopcinski?
9     A.   Yes.
10    MS. McGINLEY:  Am I pronouncing her name
11 correctly?
12    MS. SCARRY:  Kopcinski, yes.
13    MS. McGINLEY:  Kopcinski.
14 BY MS. McGINLEY:
15    Q.   And how did you become involved in that
16 investigation?
17    A.   I think probably the first thing of my
18 involvement was when I took a flyer to a Glenview
19 detectives meeting that I went to monthly, and I was
20 the dayshift Detective, so I, generally, was the guy
21 going to that meeting.
22       And it's really nothing more than a
23 gathering of pass-on's from guys from different
24 departments. I took that one with me because she had

Page 11

1  been missing for a little while. I don't remember
2  how long it had been.
3        And then my next involvement was when I
4  was sent with Pistorius to the house on Oak Street.
5     Q.   Do you recall around when that meeting
6  was, the first meeting you referred to?
7     A.   The Glenview Detectives meeting? It
8  could have been in October. It could have been in
9  November. I honestly don't remember.
10    Q.   Okay. Of 2005?
11    A.   Yes.
12    Q.   And then were you involved in getting any
13 statements from witnesses prior to the date that you
14 went with Officer Pistorius to Mr. Spencer's house?
15    A.   Not that I recall, no.
16    Q.   Did you come to learn of an interview
17 with Lisa Candir?
18    A.   Yeah, I believe so.
19    Q.   And when did you learn about that?
20    A.   I think the first time I knew about
21 that -- any interview with her or I had any knowledge
22 of it was probably the night that we went to the Oak
23 Street house in Palatine.
24    Q.   Before you went?

Page 12

1     A.   Yes.
2     Q.   And had you ever spoken to Mr. Spencer
3  before that night?
4     A.   No, don't believe I'd ever met him
5  before.
6     Q.   Had you ever learned of any interview of
7  Michael Spencer before that night?
8     A.   No. I don't believe so.
9     Q.   So how is it that you -- can you kind of
10 take me through how it was that you went to his house
11 with Officer Pistorius that night?
12    A.   Either Pistorius came to me or one of my
13 supervisors, a Commander or a Sergeant, directed me
14 to go with him to that house that night and,
15 honestly, I don't remember which.
16       I don't know which it was, if he asked me
17 or if I was told to go with him. But that's my
18 recollection is somebody said, "Go with Joe or
19 Detective Pistorius and go to the house on Oak Street
20 in Palatine."
21    Q.   Okay. What was your understanding as to
22 why you were going to the house?
23    A.   My understanding is we were going there
24 to look for Mr. Spencer. And that's about the limit



Page 13

1 of it, was we were going there to look for him.
2  Q. Did you know that you were going to
3 arrest him? Was that an instruction that was given?
4  A. I did not know that. I was not -- I
5 wasn't under the impression either way. That we were
6 going to look for Mr. Spencer and have a discussion
7 with him. So arresting him? No, I was never told
8 that.
9  Q. And what did you do when you arrived at
10 his house?
11  A. When Pistorius and I got to the house on
12 Oak Street, I was driving so my recollection is we
13 pulled in the driveway, knocked on the front door
14 several times, didn't get an answer, walked around
15 the house, couldn't see anybody in the house. May
16 have been one light or something on in the house.
17 I'm not certain.
18       I don't know if either it was me or
19 Pistorius, I believe, talked to Commander Waitzman,
20 said, "He's not here. What do you want us to do?"
21 He said, "Sit up the street a little bit and do a
22 surveillance on it, see if he comes home."
23       So that's what we did. We pulled maybe a
24 block up the street, and I couldn't tell you what

Page 14

1 cross street it was. But we pulled up there and sat
2 and waited for him or someone, just to see if someone
3 could come home -- someone would come to the house.
4  Q. About how long were you waiting would you
5 estimate?
6  A. It was probably 40 or 45 minutes, maybe.
7  Q. Okay. And then what happened?
8  A. While we were sitting there talking, the
9 overhead door on the garage came up, a lighter
10 colored car backed out of the garage, the garage door
11 came down, and the car took off northbound on Oak
12 Street at a fairly high rate of speed.
13       I couldn't tell you how fast he was
14 going, but it was obvious he was over the speed
15 limit.
16  Q. And what did you do?
17  A. We followed him. We were in an unmarked
18 Jeep Cherokee which did have red and blue lights on
19 the interior of the car. May have had some in the
20 grille as well.
21       We had -- I had a difficult time catching
22 up to him just because of the speed that he was
23 traveling in the local side streets and I'm not
24 familiar with that area, so I couldn't tell you what

Page 15

1 side streets -- what streets he took but he took a
2 rather circuitous route and eventually ended up on
3 Quentin Road.
4       My impression of that activity, of him
5 doing that, is the fact that he either knows
6 somebody's following him or he thinks somebody's
7 following him. One or the other. He's either trying
8 to shake us or he's trying to determine if he's still
9 seeing a set of headlights behind him.
10  Q. So were your lights on the entire time?
11  A. No. We never activated our emergency
12 lights at that time. Not until we got around Quentin
13 Road is when we -- and it was probably Pistorius that
14 may have activated the emergency lights in the car.
15       Because when we're together like pairs,
16 it's usually one guy's just doing the driving, the
17 other guy's just doing the radio traffic and
18 everything else.
19  Q. Do you know why you didn't activate the
20 lights if he was speeding?
21  A. We wanted to get close enough to the car
22 to get a license plate off of it, first of all; call
23 it out and see whose car it was. And that was
24 probably Pistorius that did that, not me, since I was

Page 16

1 driving.
2       And then when the car came back
3 registered to Michael Spencer is when we -- or around
4 that time is when we activated our emergency lights,
5 or reds and blues.
6  Q. And did he pull over right away when you
7 turned those lights on?
8  A. No, he did not. He proceeded southbound
9 on Quentin Road. He crossed Illinois which is right
10 at the corner where Fremd High School is. My
11 recollection is there are two entrances on Quentin
12 Road that enter into Fremd High School.
13       He didn't turn in the north entrance
14 which would have been the first one he came to. He
15 went to the south entrance. When he turned into the
16 south entrance, instead of stopping right when he
17 came in, and it's a pretty good sized parking lot, he
18 went all the way up to the school, very slowly,
19 turned. I believe his car was facing north.
20       He stopped in the very last parking spot
21 he could stop, right in front of the school. We came
22 in behind him.
23       I saw his lights flash, indicating he had
24 put his car in park. We stepped out of our car. He



Page 17

1  stepped out of his simultaneously. He stepped out,
2  he locked his doors, because I could still to this
3  day remember the doors clicking in the parking lot, I
4  could hear it, and then he stood next to the car and
5  put his keys in his pocket.
6    Q.  Okay. So he was in a parking spot close
7  to the school?
8    A.  Yes.
9    Q.  And did you -- I may have already asked
10 you this and I apologize if I did.
11       But did you have a warrant at this time
12 to arrest him?
13   A.  No.
14   Q.  And, to your knowledge, you were just
15 going there to talk to him?
16   A.  Yes.
17   Q.  By the time you pulled him over, did you
18 know that the intention was to arrest him?
19   A.  No, no.
20   Q.  Okay. What happened after he stepped out
21 of the car and you both stepped out of the car?
22   A.  We stepped out of our car. Because I was
23 in the driver's side, Joe and I crossed. I probably
24 went behind him. Joe's doing all the talking -- or

Page 18

1  Pistorius is doing all the talking. It's not my
2  case, so I'm kind of just like the limo driver for
3  him, his backup.
4       I crossed over to the passenger side of
5  Spencer's car. He went directly to Spencer who was
6  already standing outside his car. I did a cursory,
7  you know, from outside a locked vehicle, looking in,
8  seeing what I could see in the car, and Joe had a
9  conversation with him.
10      I don't know what conversation exactly
11 was being said between them because I wasn't paying
12 attention, quite honestly.
13   Q.  Okay. And you said you looked in the
14 car. Did you see anything when you looked into the
15 car?
16   A.  Yeah. My recollection is I saw at least
17 two Blackberry's or what I thought were Blackberry's
18 laying in the car; BlackBerry phones. There may have
19 been three.
20      I saw a case -- I think I saw a case in
21 the back of the car which looked like a laptop
22 type -- it may have been a canvas bag. I don't
23 recall. That's about all I remember seeing inside
24 the car.

Page 19

1    Q.  Okay. Anything that would give you, you
2  know, a suspicion that there was something illegal in
3  the car?
4    A.  Well, if I'm talking from a cop's sixth
5  sense, when I see three Blackberry's and a phone, I'm
6  thinking drug dealer, quite honestly, because who
7  carries three Blackberry phones or three cell phones
8  of any type around with them?
9    Q.  Did you think that at the time?
10   A.  I did, in my mind, yeah. I mean, it
11 crossed my mind to think, well, that's drug dealer
12 stuff when you carry phones -- you know, that
13 quantity of phones with you.
14   Q.  Did you tell that to Officer Pistorius?
15   A.  No, I don't believe I did, no.
16   Q.  Okay. Did you -- what happened after --
17 you said that Officer Pistorius was talking to
18 Mr. Spencer at that time and you were on the other
19 side of the car.
20      At that point, was he put into handcuffs
21 by Officer Pistorius?
22   A.  No. After I saw what I saw in the car,
23 and we're talking, you know, well under a minute all
24 this is transpiring. I then walked around to the

Page 20

1  driver's side of the car where Pistorius and Spencer
2  were talking.
3       Spencer was saying something to the
4  effect of "I don't know where she is. I haven't seen
5  her for a long time." Pistorius just kind of gave me
6  the -- there again, I can't describe it. It's a look
7  that we have amongst ourselves. Kind of gave me the
8  look.
9       So I went back behind our car where
10 nobody could hear my conversation. My recollection
11 is I called on my Nextel and I called Commander
12 Waitzman, and I said, "Spencer is indicating he
13 doesn't know where Anna is, hasn't seen her in some
14 period of time. What do you want us to do?"
15   Q.  And while you were doing that, was
16 Officer Pistorius still talking to --
17   A.  Yeah, he was continuing to have a
18 conversation with Mr. Spencer.
19   Q.  Okay. And then what did Commander
20 Waitzman tell you to do?
21   A.  He told me that they had a statement from
22 Lisa Candir, who I had never seen before -- today, I
23 don't know if I'd recognize her, either -- supporting
24 the idea that Mr. Spencer was pimping for them and



Page 21

1 they were performing acts of prostitution for drugs
2 and money as employees of his.
3 　　　　And based on that, he was to be placed
4 under arrest and we were going to tow the car.
5 　Q.　Okay. And at the time that you pulled
6 him over, you had not heard about the statement from
7 Lisa Candir?
8 　A.　No.
9 　Q.　So it wasn't until you called Officer
10 Waitzman?
11 　A.　Right, right.
12 　Q.　Okay. So then once you got that
13 direction to arrest him, did you inform Officer
14 Pistorius?
15 　A.　I walked back toward Pistorius. He could
16 see me coming toward him. I did this to him
17 (indicating), which is just one of the things I do or
18 some of the guys I work with.
19 　　　　When we do this (indicating), it's the
20 silent way to say, "that one's going in the cuffs.
21 He's under arrest."
22 　　　　MS. SCARRY: Can we go ahead and put that on
23 the record? However you want to do it.
24 　　　　MS. McGINLEY: Let the record reflect that

Page 22

1 Officer Hinds grabbed his wrist with his other hand
2 to indicate cuffs going around a wrist.
3 　　　　THE WITNESS: Right.
4 BY MS. McGINLEY:
5 　Q.　Okay. So you made that signal to Officer
6 Pistorius and at that time, was he put into
7 handcuffs?
8 　A.　Yes. He ended his conversation with
9 Mr. Spencer and told him he was under arrest and to
10 turn around and put his hands behind his back, which
11 he did, and then he placed cuffs on him.
12 　Q.　And how did Mr. Spencer act during the
13 time that he was pulled over and being questioned?
14 Was he cooperative?
15 　A.　Yeah, I would say he was cooperative.
16 　Q.　He answered the questions to the extent
17 you overheard?
18 　A.　Yes, yes. There was no -- it didn't seem
19 to be any hostility between him and Pistorius. I
20 mean, if that had been the case, I wouldn't have been
21 on the passenger side of the car.
22 　　　　So it was more or less just two people
23 having a conversation and voices weren't raised or
24 anything like that. No hostility when cuffs went on

Page 23

1 him, either. He was cooperative and did what we
2 asked him to.
3 　Q.　Okay. What happened after he was put in
4 cuffs?
5 　A.　We called for a cage car or a marked
6 patrol car since we were in an unmarked vehicle to
7 come over, and I think that was Ryan McMahon that
8 came to the scene, and Spencer was placed in the back
9 of McMahon's car.
10 　Q.　So before McMahon arrived, you were
11 standing outside of the two cars, Mr. Spencer's car
12 and your car, waiting for some -- the marked vehicle
13 to arrive?
14 　A.　Right, right.
15 　Q.　How long did that take?
16 　A.　Not long. Minute and a half, two
17 minutes, maybe. Something like that.
18 　Q.　Did you tell Mr. Spencer why he was being
19 arrested?
20 　A.　I did not. I didn't have any
21 conversation with him.
22 　Q.　Did you overhear any conversation with
23 him during that time?
24 　A.　No, uh-uh.

Page 24

1 　Q.　And when Mr. McMahon arrived, was he the
2 only other officer who was there at that time?
3 　A.　Either just before or just after him,
4 Detective Cook arrived.
5 　Q.　Okay. And Detective Cook came in a
6 separate vehicle?
7 　A.　Yes.
8 　Q.　Was he by himself?
9 　A.　Yes.
10 　Q.　And --
11 　A.　Or I believe he was. That's my
12 recollection, is it was just Dan by himself.
13 　Q.　And what happened after -- I guess did --
14 strike that.
15 　　　　Did Mr. -- or Officer McMahon leave with
16 Mr. Spencer before Officer Cook arrived?
17 　A.　I can't say for sure.
18 　Q.　Okay. What happened after Officer
19 McMahon left?
20 　A.　At some point around there and he --
21 Spencer may have still been there. I mean, the
22 keys -- Pistorius got ahold of Spencer's keys so that
23 we could unlock the car versus slim-jimming it or
24 some other way to get in. So we used keys to get in.



Page 25

1  Then we started searching the car.
2     Q.   And so at that time -- at the time that
3  you began searching the car, Officer McMahon and
4  Spencer had already left the scene?
5     A.   I can't say for sure. Yes, probably, or
6  he was in the car -- he had Spencer in his car and
7  may not have left right then. But, yes, around that
8  time, he did leave with him.
9     Q.   Okay. And Officer Cook was there at the
10 time that the car was searched?
11    A.   Yes.
12    Q.   Okay. And can you describe to me the
13 steps that kind of you took with Officer Pistorius or
14 anyone else involved in searching the car? Who was
15 searching where?
16    A.   I believe Joe unlocked the doors so that
17 I could get in. I got in from the passenger's side,
18 and I checked the phones that I saw up in the front
19 seat or in the console area, started looking under
20 the seats, the visor, glove compartment, all the
21 normal spots that we look. Center console if the car
22 had one. I don't remember if that car did or not.
23         Basically, I'm working the whole interior
24 of the car because I figure we have probable cause to

Page 26

1  look for the stuff. So I'm doing a search top to
2  bottom. I'm not tearing the car apart, but anything
3  that can be opened is getting opened.
4     Q.   Why did you believe you had probable
5  cause?
6     A.   Well, nobody told me that we had probable
7  cause but the fact that I'm told that we have
8  probable cause to arrest him for something, if that
9  comes from another officer, then I'm going to take
10 his word for it. You know, it's not my case. Like I
11 said, I had very limited involvement with this thing
12 prior to that night.
13        So once I know that we have the probable
14 cause to arrest, and we arrested him in his car, it
15 is not just an incident to arrest search of the car.
16 It's an incident -- it's no longer an incident. It's
17 probable cause why we are looking.
18    Q.   So the reason he was arrested, was that
19 pandering?
20    A.   Pimping, yeah, prostitution, yes.
21    Q.   Sure. And so you say probable cause
22 existed to arrest him for that?
23    A.   Right.
24    Q.   Does it naturally follow that there's

Page 27

1  probable cause to search his vehicle?
2     A.   Well, the fact that he's in the vehicle,
3  the fact that a search of him revealed about $8,000
4  cash bundled and, in my opinion, similar to the way
5  drug dealers carry their cash, you know, groups of a
6  thousand dollars worth of U.S. C with a rubber band
7  around it, folded like that (indicating), bundle
8  after bundle. That's similar to what drug dealers
9  do.
10        So reasonable suspicion and probable
11 cause to me are all running along the same lines with
12 this, but probable cause is there.
13    Q.   Did you search the car because you
14 believed you had probable cause or were you
15 instructed to search it?
16    A.   I don't recall that ever coming up. I
17 don't -- we searched the car.
18    Q.   Nobody instructed you to search it?
19    A.   No. As a backup, it's just part of my
20 job. It's what we do. You get two, three officers
21 on a scene and we all -- if we've worked together for
22 a long time, we all just kind of -- we're like worker
23 hands. We just start doing our thing.
24    Q.   Okay. And so is Commander Waitzman there

Page 28

1  at that time?
2     A.   I can't say for sure. I don't remember
3  if he was at the scene or not at that time.
4     Q.   And when you spoke to him earlier before
5  the arrest, did he instruct you at that time to
6  search the car or just to arrest him?
7         MS. SCARRY: Objection, form of the question.
8         Go ahead and answer.
9  BY MS. McGINLEY:
10    Q.   Let me clarify the question. At the time
11 that he instructed you to arrest Mr. Spencer, which I
12 believe was your testimony?
13    A.   Right.
14    Q.   Did he also inform you to search the
15 vehicle?
16    A.   He told me to have the car towed. I
17 can't recall if he told me to search it as well. I
18 wouldn't have needed to be told. I would have done
19 it anyway. I don't need a supervisor to tell me when
20 to search a car, normally speaking.
21    Q.   But he did tell you to tow the vehicle?
22    A.   He did tell us to tow it, yes.
23    Q.   And would the normal practice be to
24 search a vehicle if it was being towed?



Page 29

1  A. At bear minimum, an inventory search,
2  yes, would be done if it's being towed.
3  Q. Even if it's towed back to the police
4  department?
5  A. Yes, right.
6  Q. Okay. So is it your recollection that
7  you followed the Rolling Meadows Police Department
8  policies and procedures on both towing and search and
9  seizure?
10  A. Yes.
11  Q. Okay. Let's go back to the search of the
12  vehicle. Did you -- where were you searching in the
13  vehicle?
14  A. Well, I started -- I think I went in
15  through the front passenger door, searched the
16  interior of the car. And then at some point,
17  Pistorius had moved to the back of the car and had
18  popped the trunk and was in the trunk of the car.
19       And at some point, I don't remember
20  exactly when, he called me back there to come back to
21  the trunk to see what he had found.
22  Q. Was anyone else searching the vehicle or
23  just you two?
24  A. Cook might have been, but I think Cook

Page 30

1  was at the trunk with Pistorius, I believe.
2  Q. And were you planning on searching the
3  trunk?
4  A. Yes.
5  Q. So you weren't surprised that Pistorius
6  had opened the trunk?
7  A. Nope.
8  Q. And would you normally open the trunk in
9  a custodial inventory search?
10  A. Of an inventory search? Not necessarily.
11  It would depend if I was getting into that probable
12  cause zone again, but on an inventory search of just
13  a car being towed, no, at that time I would not have
14  probably gone into the trunk on inventory.
15  Q. Okay. Did anybody actually take a
16  written inventory of the items found in the car?
17  A. Well, I inventoried some of the stuff
18  that was in the car or took possession of it. It may
19  have gone into our Investigations vehicle. I can't
20  say for sure whether we transported it or not.
21       I'm pretty sure it was us that
22  transported it because I think McMahon was already
23  gone from the scene so he would have had Spencer at
24  the station. So it probably was in our car that we

Page 31

1  took possession of the items.
2  Q. So you took possession of the items that
3  were identified in the car and moved them into your
4  vehicle?
5  A. Yes.
6  Q. But there was no written document
7  prepared at the school parking lot?
8  A. No, no.
9  Q. And then was the vehicle towed while you
10  were there?
11  A. No. I think Pistorius and I left the
12  scene and went back to the station.
13  Q. And did you leave the vehicle keys there?
14  A. Yeah. At least the ignition key would
15  have been left with the vehicle.
16  Q. Going back to the search, did you ever
17  have the keys to the car or the key chain in your
18  possession?
19  A. At the scene?
20  Q. Uh-huh.
21  A. I don't think so. I can't say for sure.
22  Q. When you -- you testified that you were
23  searching the vehicle and Officer Pistorius was at
24  the trunk.

Page 32

1       What did he do then?
2  A. He called me back there once he was in
3  the trunk. He was in there for some period of time.
4  It wasn't long. And then he called me back to the
5  back end of the car.
6  Q. And what did you see?
7  A. I saw -- there was a Sentry safe in the
8  back of the car, and that's all I recall right now is
9  the Sentry safe was back there.
10  Q. Was it open or closed when you went back
11  there?
12  A. I think it was closed.
13  Q. And did you see it open?
14  A. I saw it opened at the station.
15  Q. But you didn't see it open in the parking
16  lot?
17  A. I can't say for sure whether I did or
18  not. I don't -- I don't think I saw it open at the
19  scene.
20  Q. So the only thing you saw in the vehicle
21  was -- in the trunk, I apologize, in the trunk was a
22  closed safe?
23       MS. SCARRY: Objection to form of the question.
24       Go ahead and answer it.



Page 33

1  BY THE WITNESS:
2      A.   Yes.
3  BY MS. McGINLEY:
4      Q.   Did you see anything else in the trunk?
5      A.   Not that I recall.
6      Q.   Did you see -- what did you find in the
7  vehicle, the interior of the car?
8      A.   A couple cell phones, the computer. I
9  believe there was a computer in the computer bag that
10 I mentioned. There may have been some paper records
11 and stuff in there, too, which may have been inside
12 that bag that the computer was in as well.
13     Q.   Okay. Anything else that you recall?
14     A.   I don't think so.
15     Q.   And then what did you do, if anything,
16 with those items?
17     A.   Right then, I don't think I did anything
18 with them. I think I left them where they were
19 because I had been called back to the trunk by
20 Pistorius.
21          And then at some point we would have
22 removed those items from the car and probably put
23 them in paper bags so we could keep track of them,
24 and put them in our car.

Page 34

1      Q.   In your Jeep?
2      A.   Yes.
3      Q.   Okay. And is it typical to search the
4  vehicle at the location where it's stopped as opposed
5  to having it towed and searching it when it's back at
6  the police department?
7      A.   I would say it's typical to search it at
8  the scene and then depending on what the nature of
9  your case is, then it may very well be getting towed
10 to the impound lot. You're not going to be at the
11 car anymore unless you go there, or you're going to
12 tow it to our station.
13          So in this case, yes, we checked it on
14 the street but, ultimately, it did get towed to our
15 station.
16     Q.   And was there any -- you didn't have a
17 warrant to search the vehicle, did you?
18     A.   No.
19     Q.   And why was it that you didn't get a
20 warrant to search the vehicle?
21     A.   We had probable cause, so we don't need a
22 warrant to search the vehicle.
23     Q.   Were you aware of the facts establishing
24 probable cause at that time?

Page 35

1      A.   In my mind, based on what I had going on
2  around me without somebody telling me, the probable
3  cause was there, and we were just -- like I said,
4  we're worker hands and we're doing our thing.
5           Nobody's telling us to not search the car
6  because that can happen as well, you know, if they
7  don't want it searched at the time.
8      Q.   But you hadn't read the statement of
9  Ms. Candir's interview at that time, had you?
10     A.   No, no.
11     Q.   And you didn't know why you were going to
12 the house to talk to Mr. Spencer that night, did you?
13     A.   Well, I knew about the missing person
14 case that was going on and about his alleged business
15 and the girls working for him so, yeah, I mean, I
16 had -- I guess I had some -- I had thoughts in my
17 head as to why we were going there, but nothing
18 specific.
19     Q.   Okay. And so what facts exactly do you
20 think would have supported probable cause at the time
21 to search the vehicle?
22          MS. SCARRY: I'm just going to object to the
23 form of the question based on his prior testimony.
24          Other than that, you can go ahead and

Page 36

1  answer the question.
2  BY THE WITNESS:
3      A.   Well, the fact that he's under arrest for
4  pimping or prostitution, the fact that we are finding
5  large sums of money on him, there's a safe in the
6  back of the car. Everything put together tells me in
7  my mind, without having to be told, there's probable
8  cause there.
9  BY MS. McGINLEY:
10     Q.   Okay. What happened after you left the
11 high school parking lot?
12     A.   We returned to the station, Pistorius and
13 I.
14     Q.   Did you stop anywhere on the way?
15     A.   No.
16     Q.   And then what happened when you arrived
17 at the station?
18     A.   I saw McMahon. I think he was in our
19 processing area, the booking room area, and he was --
20 had patted down or was patting down Mr. Spencer,
21 pulling the money out of his jacket, and wherever --
22 everything he had in his pockets, jacket, pants,
23 whatever, shirt, everything was being emptied out of
24 his pockets -- or had been emptied out of his pockets



Page 37

1  at that time.
2      And I think I took possession of all that
3  stuff and took it up to the third floor conference
4  room in our Investigations Unit.
5      Q.   And then what did you do in the
6  Investigations Unit conference room?
7      A.   Well, at some point, all the money ended
8  up in my hands, all of the money that we had found
9  ended up in my hands to count and place into
10 evidence.  There was other stuff.
11     The safe was opened and other things were
12 in there which were cataloged and logged into
13 evidence and properly packaged.  That's about it.
14     Q.   Was that the first time you had seen the
15 safe opened was in the conference room?
16     MS. SCARRY:  Objection, form of the question.
17     Go ahead and answer.
18 BY THE WITNESS:
19     A.   I think so, yes.
20 BY MS. McGINLEY:
21     Q.   Was that the first time you saw the
22 contents of the safe in the conference room?
23     A.   Yes.
24     Q.   And who was responsible for bringing the

Page 38

1  safe from the Jeep into the police department?
2      A.   I honestly don't recall.  I don't
3  remember carrying it in myself.  I don't know who
4  would have brought it in.  It probably would have
5  been me or Pistorius, but I don't remember which one
6  of us it was.
7      Q.   Where was Spencer when you were counting
8  the money in the conference room and --
9      A.   He may have been moved to another
10 interview room.  We have three interview rooms up
11 there.  He was not in the conference room at the time
12 that I was dealing with the evidentiary side of this
13 case, so he was probably in one of the other
14 interview rooms.
15     Q.   Was he brought into the room with the
16 evidence at any point?
17     A.   Yeah, I believe he was at some point.  I
18 couldn't tell you when, but I do recall him being
19 brought into the room, yes.
20     Q.   And were you in the conference room
21 dealing with the evidentiary issues or were you -- I
22 guess, were you in there -- how long were you in
23 there?
24     A.   Oh, I honestly can't say.  It would have

Page 39

1  been more than a half hour at least before I think it
2  was Waitzman came to us.
3      I stepped out of the room at the point
4  that they brought Spencer in the room, and Waitzman
5  and him were in the room.  And Deputy Chief Scanlon
6  may have been there as well at that time.
7      Q.   Did you interview Mr. Spencer at all that
8  evening?
9      A.   No, no.
10     Q.   Were you in the room when Commander
11 Waitzman was in there with Mr. Spencer?
12     A.   No.
13     Q.   Were you in the other room that you
14 mentioned Mr. Spencer was in?
15     A.   During an interview?
16     Q.   During an interview or at all.
17     A.   No, no.
18     Q.   Are you aware that Mr. Spencer at some
19 point left with some of the officers and went to
20 Elgin that night?
21     A.   Yes.
22     Q.   Were you in that group of officers that
23 went?
24     A.   Yes.

Page 40

1      Q.   And can you explain to me how it -- how
2  you became involved with going to Elgin that night?
3      A.   Supervisor probably told me to get in the
4  car and follow them.  That's probably how that went.
5      Q.   Do you remember being told why you were
6  going to Elgin?
7      A.   My recollection is we were going to Elgin
8  for the possibility of finding the missing 17-year-
9  old that we were looking for.
10     Q.   And do you know why Mr. Spencer was going
11 as well?
12     A.   No, I don't know.
13     Q.   Were you surprised to learn that he was
14 going along?
15     A.   No, not really.
16     Q.   That's not unusual?
17     A.   No.  I'm not going to say it happens
18 every day, but it does happen, you know.
19     Q.   And did you ride with Mr. Spencer?
20     A.   No.
21     Q.   Who did you ride with?  Or drive.
22     A.   I may have been with Pistorius or Cook or
23 maybe all three of us were in a car.  I know I was
24 not in the car with Spencer.  I know that.  But I



Page 41

```
 1  honestly can't say who I was with.
 2    Q.   Were you driving or a passenger?
 3    A.   I think I was a passenger.
 4    Q.   And what happened when you got to the
 5  destination in Elgin?
 6    A.   I stayed outside the house.  I don't
 7  believe I was ever in that house.  We did not find
 8  our missing person there.
 9    Q.   Did you know whose house it was?
10    A.   No.
11    Q.   And what were your responsibilities
12  standing outside the house?
13    A.   Looking for somebody bailing out a window
14  or contraband flying out of windows, things of that
15  nature.  That's why I was outside.
16    Q.   And did you see anything like that?
17    A.   No.
18    Q.   And what happened when you -- after the
19  officers went to that house?
20    A.   They came out, and we got back in our
21  cars, and we left.
22    Q.   Do you recall who drove with Mr. Spencer?
23    A.   It might have been Waitzman and Scanlon.
24  I can't say for sure because I wasn't in the car.  I
```

Page 42

```
 1  think it was probably Waitzman and Scanlon.
 2    Q.   Do you recall what vehicle they were in?
 3    A.   No, I don't.
 4    Q.   Okay.  I'm going to, sorry, jump back to
 5  the police department before you went to Elgin.
 6         At that time, you said you were dealing
 7  with evidentiary issues, evidentiary stuff in the
 8  conference room.  At that time, was a written
 9  inventory of the contents of Mr. Spencer's vehicle
10  prepared?
11    A.   Somewhere along that timeline, yes.
12    Q.   And did you prepare that?
13    A.   Yeah, I believe I did.  It could have
14  been more than one of us involved but, yeah, I
15  believe I did do it.
16    Q.   Okay.  Leaving the night of -- and that
17  was January 4th, the night of the arrest, is that
18  correct?
19    A.   Yes.
20    Q.   Did you ever go back to Mr. Spencer's
21  house after that night?
22         And I guess, let me clarify.  It's 568
23  Oak Street, whether or not you know that's
24  Mr. Spencer's house or not, but in Palatine.
```

Page 43

```
 1    A.   I believe the next day -- the next day or
 2  the following day, we had a search warrant and went
 3  to that house with a dog.
 4    Q.   And why did you get a search warrant?
 5    A.   I couldn't tell you.  I didn't get the
 6  search warrant.
 7    Q.   Who did?
 8    A.   Pistorius was probably involved with it,
 9  but I couldn't say for sure.  It's his case, so....
10    Q.   Did Pistorius go to the house?
11    A.   I can't say for sure.
12    Q.   Okay.  So you had a warrant to go search
13  this house?
14    A.   Yes.
15    Q.   And you went -- strike that.
16         Was it January 6th, 2006?
17    A.   It was the day following Spencer's arrest
18  or the day following or two days after that.  It was
19  very close to his arrest, but one or two days.  I
20  can't remember which.
21    Q.   Okay.  And what happened when you got
22  there?
23    A.   We met with Officer Johnson from the
24  Palatine Police Department, his dog Crow, and we made
```

Page 44

```
 1  entry to the house.  I don't believe there was forced
 2  entry.  I think we had keys to make entry.
 3         And canine handler Crow and his dog and I
 4  were the first people to go in that house and the
 5  only people until Crow was done with his search.
 6  That being done so as not to confuse the dog with
 7  scents, smells, whatever, and the fact that he's a
 8  highly aggressive dog and will bite pretty much
 9  anybody that gets close to him, including his
10  handler, so....
11    Q.   Okay.
12    A.   Crow is dead now but it's not a bad
13  thing.  Crow was a very mean dog.  Sorry.
14    Q.   Okay.  So once Crow went through the
15  house, what happened?
16    A.   Then other guys came in the house, other
17  officers or detectives would have come in.
18    Q.   And what was the -- what did you do?
19    A.   Well, we started seizing property in the
20  house, big screen TV's and you name it.  Whatever was
21  being seized was seized at that time.
22    Q.   And about how many officers were there?
23    A.   There was probably five of us.
24    Q.   Do you recall whether Officer Cook was
```



Page 45

1 there?
2  A. I don't recall for sure.
3  MS. McGINLEY: Okay. I'm going to mark
4 Plaintiff's Exhibit 3.
5  (WHEREUPON, certain photographs
6  were marked Plaintiff's
7  Deposition Exhibit No. 3, for
8  identification, as of
9  12/18/2012.)
10  (WHEREUPON, the document was
11  tendered to the witness.)
12 BY MS. McGINLEY:
13  Q. I'm showing you what's been marked as
14 Plaintiff's Exhibit 3. Can you flip through these
15 pictures briefly?
16  A. Looks like the interior of the Oak Street
17 house.
18  Q. And, to your recollection, is this the --
19 does this look like the way the house was left when
20 the officers left the house?
21  A. I would say yes.
22  Q. Okay.
23  A. Yes.
24  MS. McGINLEY: Okay. Can we take just a

Page 46

1 five-minute break? And then we may be able to finish
2 up on the earlier side here.
3  MS. SCARRY: Absolutely.
4  (WHEREUPON, there was a short
5  interruption.)
6  MS. McGINLEY: Back on the record.
7 BY MS. McGINLEY:
8  Q. I just have a couple followup questions.
9 Early on in the deposition, you testified that in a
10 custodial inventory search, you typically wouldn't
11 search the trunk of a vehicle.
12  Is that accurate?
13  A. If I said that, what I would say is I
14 wouldn't necessarily always search. Depends on what
15 I'm arresting the person for. So I might search the
16 trunk of a car, I might not.
17  But under an inventory search pursuant to
18 the arrest under our policy, I would have been
19 allowed to.
20  Q. And what factors would you look at to
21 decide whether to search the trunk on a custodial
22 inventory search?
23  A. If I stopped you, for example, and
24 there's nothing in there that leads me to think that

Page 47

1 you're anything more than an unlicensed driver, which
2 is what I know about you at that time, you're a
3 lawyer, you're clean-cut, you don't look to be under
4 the influence of anything.
5  So am I searching your car? Yeah, I may
6 search the interior. That would be normal. But I
7 may not search the trunk of your car, although I
8 could.
9  Q. And that's even if you're towing the car?
10  A. Yeah, yeah.
11  Q. Okay. Isn't the purpose of the custodial
12 inventory search to inventory and protect the vehicle
13 owner's belongings?
14  A. Yes, valuables.
15  Q. But the items in the trunk don't always
16 come into play under that policy?
17  A. Correct, correct.
18  MS. McGINLEY: Okay. No further questions at
19 this time.
20  MS. SCARRY: I have nothing further.
21  MS. McGINLEY: All right.
22  MS. SCARRY: We will waive signature.
23  THE COURT REPORTER: Are you ordering?
24  MS. McGINLEY: Yes. Just regular

Page 48

1 E-Transcripts.
2  MS. SCARRY: And I would like to order a copy,
3 the E-Tran as well.
4  THE COURT REPORTER: Thank you.
5  FURTHER DEPONENT SAITH NOT.



Page 49

1  STATE OF ILLINOIS )
2             ) SS:
3  COUNTY OF DU PAGE )
4        I, V. LINDA BOESCH, a Notary Public within
5  and for the County of DuPage, State of Illinois, and
6  a Certified Shorthand Reporter of said state, do
7  hereby certify:
8        That previous to the commencement of the
9  examination of the witness, the witness was duly
10 sworn to testify the whole truth concerning the
11 matters herein;
12       That the foregoing deposition transcript
13 was reported stenographically by me, was thereafter
14 reduced to typewriting under my personal direction
15 and constitutes a true record of the testimony given
16 and the proceedings had;
17       That the said deposition was taken before
18 me at the time and place specified;
19       That I am not a relative or employee or
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in the
23 outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

Page 50

1  hand of office at Chicago, Illinois, this 19th day of
2  December, 2012.
3
4
5
6
7        Notary Public, DuPage County, Illinois
8        My commission expires 8-14-2013.
9
10
11 CSR Certificate No. 84-3108.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 51

1              I N D E X
2  WITNESS                    EXAMINATION
3  MARK HINDS
4     By Ms. McGinley              3
5
6
7
8            E X H I B I T S
9  NUMBER                     MARKED FOR ID
10 PLAINTIFF'S DEPOSITION
11    Exhibit No. 1               3
12    Exhibit No. 2               8
13    Exhibit No. 3              45



ROBERT DOUCET  February 14, 2013
SPENCER vs. CITY OF ROLLING MEADOWS  1–4

Page 1
1  IN THE UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4
5  MICHAEL A. SPENCER,          )
6          Plaintiff,    )
7     vs.              ) No. 08-cv-00085
8  THE CITY OF ROLLING MEADOWS,   )
9  OFFICER JOE PISTORIUS, OFFICER  )
10 MARK HINDS AND OFFICER DAN COOK, )
11         Defendants.    )
12
13
14      The deposition of ROBERT DOUCET, called
15 by the Plaintiff for examination, taken pursuant to
16 the Federal Rules of Civil Procedure of the United
17 States District Courts pertaining to the taking of
18 depositions, taken before JOANNE H. RICHTER, a
19 Notary Public within and for the County of Cook,
20 State of Illinois, and a Certified Shorthand
21 Reporter of said state, No. 84-2082, at 70 West
22 Madison Street, Suite 3100, Chicago, Illinois, on
23 the 14th day of February, A.D. 2013, at 10:05 a.m.
24

Page 2
1  PRESENT:
2
3     K&L GATES LLP
4     (70 West Madison Street, Suite 3100
5     Chicago, Illinois  60602-4207
6     312.372.1121), by:
7     MS. MOLLY K. McGINLEY,
8        appeared on behalf of the Plaintiff;
9
10    DeANO & SCARRY
11    (53 West Jackson Boulevard, Suite 550
12    Chicago, Illinois  60604
13    630.690.2800), by:
14    MS. LAURA L. SCARRY,
15       appeared on behalf of the Defendants
16    and the Deponent.
17
18
19
20 REPORTED BY:  JOANNE H. RICHTER,
21        C.S.R. No. 84-2082.
22
23
24

Page 3
1      (WHEREUPON, the witness was duly
2      sworn.)
3      MS. McGINLEY:  Let the record reflect that
4  this is the deposition of Robert Doucet in
5  Spencer versus the City of Rolling Meadows,
6  Case No. 08-cv-85.
7      ROBERT DOUCET,
8  called as a witness herein, having been first duly
9  sworn, was examined and testified as follows:
10     EXAMINATION
11 BY MS. McGINLEY:
12   Q.   Can you please state your name, for the
13 record.
14   A.   Robert Doucet.
15   Q.   Can you spell your last name?
16   A.   D-o-u-c-e-t.
17   Q.   You are currently employed at the
18 Rolling Meadows Police Department?
19   A.   No, I am not.
20   Q.   Where are you currently employed?
21   A.   West Suburban Bank.
22   Q.   Were you previously employed --
23   A.   Yes.
24      (WHEREUPON, discussion was had

Page 4
1      off the record.)
2  BY MS. McGINLEY:
3   Q.   You were saying, were you previously
4  employed by the Rolling Meadows Police Department?
5   A.   Yes.
6   Q.   When was that?
7   A.   From June 2000 until officially
8  August of 2009, but I was on leave starting
9  August 2008.
10  Q.   And during that time period, what was
11 your title?
12  A.   Patrol officer and then detective.
13  Q.   In October 2005 through January 2006,
14 what was your title?
15  A.   Detective.
16  Q.   Did you review any documents today?
17  A.   Yes.
18  Q.   What did you review?
19  A.   My police reports and prior testimony.
20  Q.   Have you been deposed before?
21  A.   Yes -- no, no, I have not.  Sorry.
22  Q.   I will just go through the ground rules
23 just to make sure you know what to expect.  If you
24 answer a question, I will assume that you



ROBERT DOUCET  
SPENCER vs. CITY OF ROLLING MEADOWS  
February 14, 2013  
5–8

Page 5

1 understood the question.
2    A.   Okay.
3    Q.   If you don't understand a question, feel
4 free to ask me to clarify.
5        Make sure that you give a verbal answer
6 for the court reporter rather than a nod of the
7 head.
8    A.   Okay.
9    Q.   And if you need a break at any point,
10 just let me know. But if you can answer any
11 pending questions before we go on break, that would
12 be good.
13    A.   Okay.
14    Q.   Do you recall working on the missing
15 persons investigation for Anna Kupcinski in 2005?
16    A.   Yes.
17    Q.   How did you become involved?
18    A.   With Detective Joe Pistorius, I was
19 assisting him.
20    Q.   What was your involvement, initially, in
21 the case? What was the first, kind of, way you
22 became involved in the investigation?
23    A.   Working with him, when he was attempting
24 to find the missing person; just tag along with

Page 6

1 him.
2    Q.   Did you at some point interview
3 Lisa Candir?
4    A.   Yes.
5    Q.   Are you aware of an interview of
6 Lisa Candir in November 2005 prior to the date you
7 interviewed her?
8    A.   I don't know.
9    Q.   Do you recall that Detectives Pistorius
10 and Waitzman interviewed her prior to your
11 interview?
12    A.   No, I don't know.
13    Q.   Do you recall learning anything about
14 Lisa Candir before you interviewed her?
15    A.   Not that I remember. It was so long
16 ago.
17    Q.   When was the first time you met Michael
18 Spencer?
19    A.   When we went to his -- the Palatine
20 home. I believe it was on Oak Street. That's when
21 I first came in contact with him.
22    Q.   Was that in October 2005, does that
23 sound correct?
24    A.   I don't know, but I know it was early

Page 7

1 on.
2    Q.   Was Michael Spencer cooperative when you
3 talked to him at that initial meeting?
4    A.   From what I remember, yes. I didn't
5 necessarily have conversations with him, as
6 Detective Pistorius handled most of the
7 conversation.
8    Q.   What was your role in that interview or
9 part of the investigation?
10    A.   In that particular day?
11    Q.   Yes.
12    A.   Incident? Just standing by. It was
13 just, kind of, protocol for a detective in those
14 types of deals to have a partner out with them.
15    Q.   Did you ask him any questions?
16    A.   No.
17    Q.   What do you recall happening in that
18 interview?
19    A.   I wouldn't classify it as an interview.
20    Q.   I guess, portion of the investigation.
21    A.   Sure. We walked up to the house. When
22 we saw a gentleman and a female, identified himself
23 as Michael Spencer. And then Hannah, I believe,
24 was with him. And then we went inside the house,

Page 8

1 with his permission, of course. And him and Joe
2 walked -- Detective Pistorius walked through the
3 house while I stood by the front door with Hannah.
4    Q.   So you did not walk through the house?
5    A.   No.
6    Q.   Did you learn what Detective Pistorius
7 saw when he walked through the house?
8    A.   Eventually, yes.
9    Q.   Did you learn about it before you talked
10 to Ms. Candir?
11    A.   Yes.
12    Q.   Were there regular meetings among the
13 detectives about this missing person's case?
14    A.   Yes.
15    Q.   When did those generally occur?
16    A.   I can't say exactly.
17    Q.   How frequently did they occur?
18    A.   You know, there was always briefings on
19 a serious case. And everybody was, kind of,
20 brought up to speed on some things, or assigned --
21 or asked to do certain things, so when they are
22 needed, I guess.
23    Q.   Were they weekly?
24    A.   Usually, we had, weekly, to talk

